**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |
|---|---|
| DODOTS LICENSING SOLUTIONS LLC,<br><br>        Plaintiff,<br><br>vs.<br><br>APPLE INC., BEST BUY STORES, L.P.,<br>BESTBUY.COM, LLC, and BEST BUY<br>TEXAS.COM, LLC,<br>        Defendants. | Case No. 6:22-cv-00533<br><br>Jury Trial Demanded |

## COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

This is an action for infringement of U.S. Patent Nos. 9,369,545; 8,020,083; and

8,510,407 (the "patents-in-suit"), in which Plaintiff DoDots Licensing Solutions LLC

("DoDots"), makes the following allegations against Defendant Apple Inc. ("Apple")

and Best Buy Stores, L.P., Bestbuy.com, LLC and Best Buy Texas.com, LLC (collectively,

"Best Buy," or "BBY) (collectively with Apple, "Defendants"):

### THE PARTIES

1.     DoDots is a Texas limited liability company with a place of business at

32932 Pacific Coast Highway, #14-164 Dana Point, CA 92629.

2.     Upon information and belief, Apple is a California corporation with

regular and established places of business throughout this District, including at least at

W. Parmer Ln. & Dallas Dr., Austin, TX 78729 and 3121 Palm Way, Austin, TX 78758,

which are located within the subpoena power of this Court. Apple is registered to do

business in Texas and may be served via its registered agent at CT Corp System, located at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

3.     Apple sells and offers to sell products and services throughout Texas, including in this judicial district, and introduces products and services that perform infringing methods or processes into the stream of commerce knowing that they would be sold in Texas and this judicial District.

4.     Apple's products are offered for sale through numerous mobile carriers in this judicial District, including, but not limited to Verizon stores at 2812 W Loop 340 Suite# H-12, Waco, TX 76711; 1820 S Valley Mills Dr, Waco, TX 7671; and 3590 Greenlawn Blvd Suite 103, Round Rock, TX 78664; T-Mobile Stores at 2448 W Loop 340 Suite 24a, Waco, TX 76711 and 208 Hewitt Dr Suite #200, Waco, TX 76712; and AT&T Stores at 4330 W Waco Dr, Waco, TX 76710; 2320 W Loop 340 #100A, Waco, TX 76711; and 1515 Hewitt Dr Ste A, Waco, TX 76712 (collectively, "Waco and Austin Carrier Stores"). On information and belief, Apple products relevant to the allegations in this Complaint have been sold and used at the Waco and Austin Carrier Stores, and are offered for sale at the Waco and Austin Carrier Stores.

5.     Apple has authorized sellers and sales representatives that offer and sell accused Apple products relevant to this Complaint throughout the State of Texas, including in this District, and to consumers throughout this District, such as: Best Buy, 4627 S Jack Kultgen Expy, Waco, TX 76706 and 11066 Pecan Park Blvd Ste 300, Cedar Park, TX 78613.

6.      Apple also owns and operates Apple Stores in multiple locations in this District including stores at 3121 Palm Way, Austin, TX 78758; 2901 S. Capital of Texas Hwy, Austin, TX 78746; 15900 La Cantera Parkway, San Antonio, TX 78256; 7400 San Pedro Avenue, San Antonio, TX 78216; and 8401 Gateway Boulevard West, El Paso, TX 79925 where accused Apple products relevant to the allegations in this Complaint have been sold and used, and offered for sale.

7.      Apple also operates a growing $1 billion campus in this District at W. Parmer Ln. & Dallas Dr., Austin, TX 78729. On information and belief, and according to publicly available reports, the Apple Austin campus will initially employ over 5000 people with the ability to employ up to 15,000 people.

https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/

8.      Defendant Best Buy Stores, L.P. is a corporation organized and existing under the laws of Virginia with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

9.      Defendant BestBuy.com, LLC is a corporation organized and existing under the laws of Virginia with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

10.     Defendant Best Buy Texas.com, LLC is a corporation organized and existing under the laws of Virginia with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

<u>**JURISDICTION AND VENUE**</u>

11.    This is an action for infringement of U.S. patent nos. 9,369,545; 8,020,083; and 8,510,407 arising under the patent laws of the United States, Title 35 of the United States Code.

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.    This Court has personal jurisdiction over Apple in this action pursuant to due process, by virtue of at least the substantial business Apple conducts in this forum, directly and/or through intermediaries, including but not limited to: (1) having committed acts within the Western District of Texas giving rise to this action and having established minimum contacts with this forum such that the exercise of jurisdiction over Apple would not offend traditional notions of fair play and substantial justice; (2) having directed its activities to customers in the State of Texas and this District, solicited business in the State of Texas and this District, transacted business within the State of Texas and this District and attempted to derive financial benefit from residents of the State of Texas and this District, including benefits directly related to the instant patent infringement causes of action set forth herein; (3) having placed its products and services into the stream of commerce throughout the United States and having been actively engaged in transacting business in Texas and in this District; and (4) either individually, as members of a common business enterprise, and/or in conjunction with third parties, having committed acts of infringement within Texas and in this District.

14.     Apple has committed and continues to commit acts of infringement in this District directly and through third parties by, among other things, making, using, performing, selling (including through websites), offering to sell, distributing, and/or importing products and/or services that infringe the patents-in-suit as defined below.

15.     Apple has, directly or through its distribution network, purposefully and voluntarily placed infringing products in the stream of commerce knowing and expecting consumers within Texas and in this District to purchase and use them.

16.     Apple has committed direct infringement in Texas.

17.     Apple has transacted, and as of the time of filing of the Complaint, continues to transact business within this District.

18.     Apple derives substantial revenues from its infringing acts in this District, including from its manufacture, use and sale of infringing products in the United States.

19.     Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1400(b).

20.     BBY has committed acts of infringement in this judicial district.

21.     BBY has a regular established place of business in this judicial district at 4627 S. Jack Kultgen Expy, Waco, TX 76706.



22.    On information and belief, the Court has personal jurisdiction over BBY because BBY has committed, and continues to commit, acts of infringement in the state of Texas, has conducted business in the State of Texas, and/or has engaged in continuous and systematic activities in the State of Texas.

23.    On information and belief, BBY's instrumentalities that are alleged herein to infringe were and continue to be used, imported, offered for sale, and/or sold in the Western District of Texas.

24.    BBY has agreed, on multiple occasions, that Best Buy Stores, L.P., BestBuy.com, LLC, and Best Buy Texas.com LLC, all subsidiaries of Defendant Best Buy Co., Inc., were proper defendants in this District and have agreed to not challenge venue for those defendants. *See, e.g., MV3 Partners, LLC v. Best Buy Co.*, Case No. 18-cv-374 (WD.Tex), ECF No. 29 and *NXP USA Inc., v. Mediatek Inc. et al.*, Case No. 21-cv-318, (WD. Tex), ECF No. 40 ("Substitute Best Buy Defendants are the proper parties to defend against allegations made in this patent infringement lawsuit.").

## Background

25.     This case arises from groundbreaking technology that the named inventors of the patents-in-suit developed at the turn of the 21st century. At that time, accessing content on the internet generally involved the use of web browsers such as Microsoft's Internet Explorer or Netscape Navigator running on a personal computer or primitive mobile device. Viewing internet content on many devices was hindered by the fact that existing web content and web applications were designed to fit an entire web page displayed on a traditional computer monitor. Many web pages were also slow and difficult to navigate. Various attempts to enhance the traditional web pages, such as the addition of "plug-ins", were equally unsuccessful because they only added to the "mess" of the web page. *See*

https://www.forbes.com/forbes/2000/0515/6511334a.html.

26.     John Kembel and George Kembel, twin brothers, recognized that there was dissatisfaction with the traditional web browser and that there was a "growing desire for individual users to fully control the aggregation and presentation of content and web applications that appears on a client computer." *See, e.g.,* U.S. patent no. 9,369,545, col. 1, ll. 48-51.

27.     The Kembel brothers are Stanford engineering, business, and design school alumnae. Together, they founded DoDots, Inc. and were also successful in later start-ups that were acquired by leading companies like Oracle Corporation.

28.     In view of the needs in the marketplace, the Kembels sought to develop a unique and novel technical solution to a computer-specific process of retrieving and

viewing content. The Kembels wanted to eliminate the need for a web browser all together. *See*

https://www.forbes.com/forbes/2000/0515/6511334a.html?sh=6e61f9b3e197.

29.     So, in 1999, the Kembels, along with fellow Stanford graduate student, Tony Medrano, founded DoDots, Inc. in Silicon Valley. They developed a novel approach to delivering content from the internet in the form of connected widgets or applications, called "Dots" rather than via a web browser. Those "Dots," also referred to as "Network Information Monitors," were "fully configurable frame[s] with one or more controls; the frame through which content is optionally presented." *See, e.g.,* U.S. patent no. 9,369,545, col. 4, ll 56-60.

30.     The Dots used one-tenth of the data that a traditional web page would use, thus allowing for faster loading and display of internet content. *See* Exh. 1 (Business 2.0: "Windows on the World," August 22, 2000).

31.     DoDots, Inc. raised over $20M in funding from leading Silicon Valley venture capital companies such as Softbank, Chase HQ and Merrill Lynch due to strength of their "Dot" technology.

32.      To commercialize this technology, DoDots, Inc. created a system and platform for its businesses and other third-parties to develop such widgets or apps and make them available to desktop and mobile devices. The technology was groundbreaking and revolutionary.

33.     As noted in an article by CNN in April 2000, the DoDots, Inc. technology was the "Web without a browser," and "DoDots is an application made up of small

windows called dots. Through these windows, you can take advantage of the features and services offered by certain Web sites without actually visiting them through a browser. Because the dots are small and operate outside the browser, they provide a faster, more direct link to content providers, according to representatives of DoDots, the new Internet company that makes the application . . . .' says John Kembel, the company's chief technology officer." https://www.cnn.com/2000/TECH/ computing/04/07/dodots.idg/index.html.

34.     At its height, DoDots, Inc. employed more than 100 people that were designing, innovating, and selling the DoDots, Inc. technology. *See* https://www.thefreelibrary.com/Back+to+the+launch+pad%3a+after+a+few+dorman t+years%2c+tech+entrepreneurs...-a0169825785.

35.     The success of DoDots, Inc. saw it valued at $275 million. The company listed dozens of customers that had used the technology to distribute their own Dots, including ABC, Bloomberg, Edmunds, CNET and Merriam-Webster. Seeking to capitalize on this marketplace adoption, the company evangelized the concept of Dots and demonstrated the technology to all who would listen, including at conferences attended by many leading technology companies of today. *See* Exh. 1 (Business 2.0: "Windows on the World," August 22, 2000).

36.     Indeed, companies like ABC saw the value of the Dot technology and were extremely excited to partner with DoDots, Inc. As Alan Cohen, executive vice president of marketing and advertising of ABC stated "In our continuing effort to find new ways to connect with our audience, the ABC Dot truly stands out as a

revolutionary new communication device . . . . the ABC Dot will give our viewers a chance to use their computer desktops in ways they never imagined." The ABC Dot was used with such popular shows like "Who Wants to be a Millionaire" and "NYPD Blue", among others. *See* Exh. 2, DoDots, Inc. Press Release, October 2, 2000.

37.    DoDots, Inc. launched and scaled a developer program, cultivating a community of over 400 independent Dot developers who were deploying Dots and a base of over 250,000 end-users.

38.    DoDots, Inc. also sought and entered into partnerships with leading wireless solutions providers such as 2Roam, to expand its reach to the wireless market. The CEO of 2Roam, Bryan Wargo, stated "DoDots technology is a killer application for wireless devices as it supports the information needs of the on-the-go mobile professional and, like 2Roam, enables users to maintain a constant state with their wireless content or application." And Bob D'Acquisto, 2Roam's director of business development, recognized that "[the DoDots, Inc. technology] gives 2Roam a new and unique way to package and distribute content to [its] customers . . . it's a win-win for everyone." *See* Exh. 3, DoDots, Inc. Press Release, September 7, 2000.

39.    DoDots, Inc. won back-to-back awards from DemoGod at the DEMO2000 and DEMOMobile 2001 conferences, the leading industry event for disruptive technologies at the time.

40.    DoDots, Inc. was named as an "Investor's Choice" winner at the Technologic Partners' Internet Outlook Conference held in Silicon Valley in September 2000. *See* Exh. 4, DoDots, Inc. Press Release, September 20, 2000.

41.     Unfortunately, when the industry-wide dot com bubble burst, investors withdrew support at a critical stage of its growth, leaving DoDots, Inc. with limited options. Notwithstanding the closure of DoDots, Inc., the technology it pioneered has been co-opted by numerous companies selling mobile devices, computers, and web applications, including Defendants.

**THE PATENTS-IN-SUIT**

42.     On June 14, 2016, the U.S. Patent and Trademark Office ("USPTO") duly and lawfully issued U.S. Patent No. 9,369,545 (the "'545 Patent"), entitled "Accessing and Displaying Network Content," naming John Albert Kembel, George Andrew Kembel, Daniel S. Kim, John Russell, Jake Wobbrock, Geoffrey S. Kembel, Jeremy L. Kembel, and Lynn D. Gabbay as inventors.

43.     DoDots is the lawful owner of all right, title and interest in the '545 Patent and has the right to sue and recover for past infringement of the '545 Patent. A copy of the '545 Patent is attached as Exh. 5.

44.     On September 9, 2020, the USPTO's Patent and Trial Appeal Board ("PTAB") issued a final written decision finding that "Petitioner has not shown by a preponderance of the evidence that claims 1–10 and 12–15 of the '545 patent are unpatentable." Specifically, the PTAB rejected the assertion that any of the challenged claims were invalid as obvious under § 103. The Federal Circuit affirmed the PTAB's decision on December 8, 2021. *See Lenovo Holding Co. v. DoDots Licensing Sols. LLC*, Nos. 2021-1247, 2021-1521, 2021-1580, 2021 U.S. App. LEXIS 36126, at *2 (Fed. Cir. Dec. 8, 2021).

45.     On September 13, 2011, the USPTO duly and lawfully issued U.S. Patent No. 8,020,083 (the "'083 Patent"), entitled "System and Methods for Creating and Authoring Internet Content Using Application Media Packages," naming John Kembel et al. as the inventors.

46.     DoDots is the lawful owner of all right, title and interest in the '083 Patent and has the right to sue and recover for past infringement of the '083 Patent. A copy of the '083 Patent is attached as Exh. 6.

47.     On January 19, 2021, the PTAB issued a final written decision finding that "claims 1–16 of the '083 patent have not been shown to be unpatentable." Specifically, the PTAB rejected the assertion that any of the challenged claims were invalid as obvious under § 103. The Federal Circuit affirmed the PTAB's decision on December 8, 2021. *See Lenovo Holding Co. v. DoDots Licensing Sols. LLC*, Nos. 2021-1247, 2021-1521, 2021-1580, 2021 U.S. App. LEXIS 36126, at *2 (Fed. Cir. Dec. 8, 2021).

48.     On August 13, 2013, the USPTO duly and lawfully issued U.S. Patent No. 8,510,407 (the "'407 Patent", collectively with the '545 and '083 patent, the "patents-in-suit"), entitled "Displaying Time-Varying Internet Based Data Using Application Media," naming John Kembel et al. as the inventors.

49.     DoDots is the lawful owner of all right, title and interest in the '407 Patent and has the right to sue and recover for past infringement of the '407 Patent. A copy of the '407 Patent is attached as Exh. 7.

50.     On January 5, 2021, the PTAB issued a final written decision finding that "Petitioner has not demonstrated by a preponderance of the evidence that any of claims

1, 8–13, and 20–24 are unpatentable." Specifically, the PTAB rejected the assertion that any of the challenged claims were invalid as obvious under § 103. The Federal Circuit affirmed the PTAB's decision on December 8, 2021. *See Lenovo Holding Co. v. DoDots Licensing Sols. LLC*, Nos. 2021-1247, 2021-1521, 2021-1580, 2021 U.S. App. LEXIS 36126, at *2 (Fed. Cir. Dec. 8, 2021).

## Apple's Infringing Devices and Activities

51.     Defendant Apple makes, has made, uses, has used, sells, has sold, offers for sale, and/or imports into the United States devices including mobile phones (*e.g.,* Apple iPhone, iPhone 6, iPhone 6S, iPhone 6 Plus, iPhone 6S Plus, iPhone SE, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11, iPhone 11 Pro, iPhone 11 Pro Max, iPhone 12, iPhone 12 Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone SE (Second Generation); Tablet computers (*e.g.,* iPad Air, iPad mini, and iPad Pro Tablets); Smartwatches (*e.g.,* Apple Watch (First through Seventh Generation); and iOS enabled mobile devices (*e.g.,* iPod Touches) (collectively, the "Accused Apple Devices").

52.     Additionally, beginning in 2007, Apple launched and continues to operate, use, sell, and import an operating system (*e.g.,* iOS 1.0, iOS 2.0, iOS, iOS 3.0, iOS 4.0, iOS 5.0, iOS 6.0, iOS 7.0, iOS 8.0, iOS 9.0, iOS 10.0, iOS 11.0, iOS 12.0, iOS 13.0, iOS 14.0, and iOS 15.0,) along with other software (*e.g.,* installers and the App Store app) that are pre-installed or updated on each Accused Apple Device (the "Accused Apple Software"). Apple programed and developed the Accused Apple Software specifically

for its Accused Apple Devices and is directly responsible for and has direct control over the use of the Accused Apple Software.

53.     Each and every iteration of the Accused Apple Software is specifically designed by Apple to cause the Accused Apple Devices to download applications from the Apple App Store ("Apple-Supported Apps") in a specific manner. More particularly, Apple is directly responsible for, and has direct control over, because of the way it programmed and developed the Accused Apple Software, each and every Accused Apple Device that is configured to execute the Accused Apple Software code to obtain Apple-Supported Apps by transmitting a request to the Apple App Store and receiving the Apple-Supported App in response to that request.

54.     Moreover, each Apple-Supported App, which runs with the Accused Apple Software contains specific information that allows the user experience (including the graphical user interface) of the Apple-Supported App to be presented on the display of the Accused Apple Devices.

55.     By making, selling, offering for sale, and importing the Accused Apple Devices that require the Accused Apple Software, which executes specific code to obtain, install and use Apple-Supported Apps, Apple directly infringes the patents-in-suit. Further, by making, selling, offering for sale, importing, operating and using the Accused Apple Software installed and running on the Accused Apple Devices that require the Accused Apple Software, which executes specific code to obtain and utilize Apple-Supported Apps, Apple directly infringes the patents-in-suit.

**The Accused Apple Devices Infringe the '545 Patent**

56.     Apple directly infringes all of the claims of the '545 patent.

57.     For example, Claim 1 of the '545 patent reads as follows:

(Claim 1 Preamble) A computer-implemented method of obtaining content over a network and displaying the content to a user, the method being implemented in a client computing device in operative communication with a server over a network, the client computing device including electronic storage, a display, and one or more processors configured to execute one or more computer program modules, the method comprising:

(Claim 1 limitation (a)) transmitting a request to the server over the network, the request requesting networked information monitor template;

(Claim 1 limitation (b)) receiving the requested networked information monitor template from the server over the internet, the requested networked information monitor template having been transmitted from the server over the network responsive to the transmitted request, the networked information monitor template comprising:

a definition of a viewer graphical user interface within which content in a web browser-readable language may be presented on the display of the client computing device; and

a definition of a first content element for the networked information monitor template, the definition of the first content element referencing a first network location from which the first content element for the networked information monitor template is served over the network;

(Claim 1 limitation (c)) responsive to instructions included in the requested networked information monitor template, presenting the viewer graphical user interface defined by the networked information monitor on the display of the client computing device separate from and outside of any other graphical user interface that includes user controls for specifying the first network location from which the first content element for the networked information monitor is served over the network;

(Claim 1 limitation (d)) responsive to instructions included in the requested networked information monitor template, transmitting over the network a first content request to the first network location referenced by the definition of the first content element for the networked information monitor template;

(Claim 1 limitation (e)) receiving, over the network, the first content element transmitted responsive to the first content request;

(Claim 1 limitation (f)) presenting the received the first content element in the viewer graphical user interface defined by the networked information monitor template, wherein the definition of the viewer graphical user interface and/or the first content element define all controls for enabling a user to interact with the first content element through the viewer graphical user interface.

58.     Apple infringes each step of the computer-implemented method recited in Claim 1 of the '545 patent because it implements, operates and uses its Accused Apple Software, which executes specific code to obtain, display and use Apple-Supported Apps, on its Accused Apple Devices, which are in operative communication with a server over a network and include electronic storage, a display, and one or more processors configured to execute one or more computer program modules.

59.     First, the preamble of Claim 1 is met because Apple executes, operates uses, and has direct control over a computer-implemented method of obtaining content over a network (such as the internet) and displaying the content to a user that is implemented on each and every Accused Apple Device, which are in operative communication with a server over a network and include electronic storage, a display, and one or more processors configured to execute one or more computer program modules:



Source: Medium.com, History of Apple iPhones accessed at
(https://medium.com/macoclock/history-of-apple-iphones-57c06323135b)

60.     On each of the Accused Apple Devices, the Accused Apple Software,

because Apple directly and specifically programed it to do so, practices the claimed

method by implementing code on a client computing device (*i.e.,* each Accused Apple

Device) in operative communication with a server (such as an Apple App Store server)

over a network (such as the internet), the client computing device (*i.e.,* each Accused

Apple Device) including electronic storage (such as each Accused Apple Device's

nonvolatile storage), a display (such as each Accused Apple Device's monitor/screen),

and one or more processors (such as each Accused Apple Device's processor(s))

configured to execute one or more computer program modules.

61.     Specifically, the Accused Apple Devices that execute the Accused Apple

Software have electronic storage, display, and processor that are used to communicate

over a wireless network to access the internet, as seen in the exemplary product

specifications shown below:



Source: https://www.deccanchronicle.com/technology/mobiles-and-tabs/010919/apple-iphone-11-series-complete-specifications-leaked.html

62.     Apple infringes limitation (a) of Claim 1 because the Accused Apple

Software in each and every Accused Apple Device transmits a request to a server over

the network, the request requesting a networked information monitor template. In

particular, Apple programs, executes and uses, and has direct control over the Accused

Apple Software in each and every Accused Apple Device in a specific and particular

manner so that the Accused Apple Software sends a request to an App Store server for

an application package (the application package herein is an .ipa file) over the network

and that request requests a networked information monitor template (*e.g.,* ipa file,

which is a data structure including data structures that constitute the NIM template).

63.     Apple infringes limitation (b) of Claim 1 because Apple programmed and executes the Accused Apple Software in its Accused Apple Devices to receive the requested networked information monitor ("NIM") template (such as, for example, a .ipa file corresponding to a Stock Market App/widget) from a server over the internet, the requested networked information monitor template having been transmitted from a server over the network responsive to the Accused Apple Software's transmitted request.

64.     Moreover, the Accused Apple Software requires the data structures in .ipa files for any Apple-Supported App, which includes a NIM template, to include:

> a definition of a viewer graphical user interface within which content (*e.g.,* how and where the graphical user interface presents a stock price) in a web browser-readable language (such as XML or JSON) may be presented on the display (monitor) of the client computing device (*i.e.,* each Accused Apple Devices ); and

> a definition of a first content element (incorporating the present price of a stock) for the networked information monitor template, the definition of the first content element referencing a first network location (such as using uniform resource locators) from which the first content element for the networked information monitor template is served over the network;

'545 patent, claim 1.

65.     Further, the Apple-Supported Apps (which are installed based on the information contained in the data structures in .ipa files (NIM templates)) must meet Apple's stated requirement that the Apple-Supported Apps "should include features, content, and UI that elevate it beyond a repackaged website. If your app is not particularly useful, unique, or "app-like," it doesn't belong on the App Store. If your App doesn't provide some sort of lasting entertainment value or adequate utility, it may

not be accepted." https://developer.apple.com/app-store/review/guidelines/#design.

In other words, Apple exercises direct control of the NIM templates through its App

Store requirements.

      66.     More specifically, the data structures in .ipa files for Apple-Supported

Apps define a viewer graphical user interface (*e.g.,* a user interface presented on the

screen) that may include menus, buttons, and other features. The data structures in .ipa

files for Apple-Supported Apps contain data related to the visual presentation of the

application, as suggested by the excerpts below.

## 2. Performance

**2.1 App Completeness**
Submissions to App Review, including apps you make available for pre-order, should be final versions with all necessary metadata and fully functional URLs included; placeholder text, empty websites, and other temporary content should be scrubbed before submission. Make sure your app has been tested on-device for bugs and stability before you submit it, and include demo account info (and turn on your back-end service!) if your app includes a login. If you offer in-app purchases in your app, make sure they are complete, up-to-date, and visible to the reviewer, or that you explain why not in your review notes. Please don't treat App Review as a software testing service. We will reject incomplete app bundles and binaries that crash or exhibit obvious technical problems.

Source: https://developer.apple.com/app-store/review/guidelines/#design.

Specifically, this excerpt refers to app bundles; a bundle is a collection of files submitted

to an app store for evaluation and approval. If approved, the bundle is used to create a

package file (.ipa).

      67.     Additionally, data structures in .ipa files for Apple-Supported Apps (*i.e.,*

the NIM template) comprise a definition of a first content element for the networked

information monitor template, the definition of the first content element referencing a

first network location from which the first content element for the networked

information monitor template is served over the network.

68.     For example, data structures in .ipa files for Apple-Supported Apps (*i.e.*,

the NIM templates) comprise a definition of a first content element (for the example of a

stock app, a definition of stock data (*e.g.*, stock price, daily change, percentage change,

other information, etc.) that is displayed on the user interface) referencing a first

network location (*e.g.*, a location from which the stock data may be acquired from the

internet) from which the first content is served. This is demonstrated by the image

below, which shows the Apple-Supported App causing the Accused Apple Device to

show stock information from a first network location on the device:



69.     Apple further infringes Claim 1, limitation (c) because its Accused Apple

Software in each of its Accused Apple Devices is responsive to instructions included in

the requested networked information monitor template (such as the stock app/widget),

and presents the viewer graphical user interface defined by the networked information

monitor on the display (monitor) of the client computing device (*i.e.,* each Accused

Apple Device) separate from and outside of any other graphical user interface that

includes user controls for specifying the first network location from which the first

content element (such as stock price) for the networked information monitor is served

over the network.

70.    For example, responsive to (*e.g.,* pursuant to, or as defined by) instructions

included in the requested NIM template (*e.g.,* in the app resources), the Accused Apple

Software implemented in each of the Accused Apple Devices presents the viewer with a

graphical user interface defined by the NIM template on the display of the client

computing device (*e.g.,* the user interface presented on the screen of the Accused Apple

Device) as seen in the paragraph below:

**Resources in an iOS Application**

In an iOS application, nonlocalized resources are located at the top-level of the bundle directory, along with the application's executable file and the `Info.plist` file. Most iOS applications have at least a few files at this level, including the application's icon, launch image, and one or more nib files. Although you should place most nonlocalized resources in this top-level directory, you can also create subdirectories to organize your resource files. Localized resources must be placed in one or more language-specific subdirectories, which are discussed in more detail in Localized Resources in Bundles.

Listing 2-2 shows a fictional application that includes both localized and nonlocalized resources. The nonlocalized resources include `Hand.png`, `MainWindow.nib`, `MyAppViewController.nib`, and the contents of the `WaterSounds` directory. The localized resources include everything in the `en.lproj` and `jp.lproj` directories.

Source:
https://developer.apple.com/library/archive/documentation/CoreFoundation/Conceptual/CFBundles/BundleTypes/BundleTypes.html#//apple_ref/doc/uid/10000123i-CH101-SW8

71.    Additionally, the Apple-Supported App's user interface includes user

controls (*e.g.,* buttons and menus) for specifying the first network location (*e.g.,* a record

of a stock price file at a particular web address) from which the first content element for the networked information monitor (*e.g.*, the stock data displayed in the user interface frame of the app) is served over the network (*e.g.*, over the Internet), which is shown in the images below, wherein entry of stock symbols allows one to obtain specific stock information:



72.     Apple further infringes Claim 1, limitation (d) because the Accused Apple Software in each Accused Apple Device is responsive to instructions included in the requested networked information monitor template, transmitting over the network a first content request to the first network location referenced by the definition of the first content element for the networked information monitor template. Specifically, the Accused Apple Software implemented in each of the Accused Apple Devices transmits a request to the first network location (source of the stock market data), as seen in the image below, which shows the results of the Apple-Supported App pulling information based on a specific watchlist.



73.     Apple further infringes Claim 1, limitation (e) because the Accused Apple Software in each Accused Apple Device receives, over the network, the first content element (such as stock price) transmitted responsive to the first content request. For example, responsive to instructions included in the requested networked information monitor template (*e.g.*, responsive to instructions included in the app resources associated with the Apple-Supported App requested from the Apple App Store), the Accused Apple Software in each Accused Apple Device transmits over a network a first content request (*e.g.*, a request for stock data) to the first network location referenced by the definition of the first content element for the networked information monitor template (*e.g.*, stock data, such as pricing, daily change, percentage change, other information, is served over the Internet).

74.     Finally, Apple infringes Claim 1, limitation (f) because the Accused Apple Software in each Accused Apple Device presents, though the Apple-Supported Apps, the received first content element (such as stock price) in the viewer graphical user

interface defined by the networked information monitor template (such as the data structures in .ipa file associated with the stock app/widget), wherein the definition of the viewer graphical user interface and/or the first content element (such as stock price) define all controls for enabling a user to interact with the first content element (such as stock price) through the viewer graphical user interface (such as allowing the user to select specific stocks to track).

75.     For example, the mobile snapshot below discloses different selection features (see details etc.), search menu etc.



### **The Accused Apple Devices Infringe the '083 Patent**

76.     The Accused Apple Devices infringe all of the claims of the '083 patent.

77.     For example, each Accused Apple Device infringes Claim 1 of the '083 patent, which recites the following limitations:

(preamble) A client device, the client device comprising:

(limitation (a)) electronic storage having stored thereon a plurality of networked information monitor templates defining a plurality of networked information monitors, the plurality of networked information monitor templates comprising a first networked information monitor template defining a first networked information monitor, wherein the first networked information monitor template comprises:

(limitation (b)) a content reference that comprises a network location at which content for the first networked information is accessible via a TCP/IP protocol;

(limitation (c)) a definition of a graphical user interface of the first networked information monitor that lacks controls for manually navigating a network, and that includes a frame within which content received from the network location can be displayed, and frame characteristics defining one or more color, a size, or a position on the electronic display of the frame; and

(limitation (d)) instructions configured (i) to cause the first networked information monitor to request content from the network location in the content reference via the TCP/IP protocol, and (ii) to cause the first networked information monitor to generate the graphical user interface of the first networked information monitor with the content received from the network location via the TCP/IP protocol within the frame;

(limitation (e)) an electronic display; and

(limitation (f)) one or more processors configured to access the first networked information monitor template such that the graphical user interface of the first networked information monitor is presented to a user on the electronic display having content received from the content reference therein.

78.    Specifically, each of the Accused Apple Devices meets the preamble of

Claim 1, because each one, as seen below, is a client device:



Source: Medium.com, History of Apple iPhones accessed
(https://medium.com/macoclock/history-of-apple-iphones-57c06323135b)

79.     The Accused Apple Devices meet limitation (a) of Claim 1 because each
has electronic storage having stored thereon a plurality of networked information
monitor templates defining a plurality of networked information monitors, the plurality
of networked information monitor templates comprising a first networked information
monitor template defining a first networked information monitor. Such electronic
storage is shown, for example, by the following breakdown of the Apple iPhone with
various electronic storage capacities.



Source: https://www.deccanchronicle.com/technology/mobiles-and-tabs/010919/apple-iphone-11-series-complete-specifications-leaked.html

80.     Moreover, the electronic storage of the Accused Apple Devices is shown to have stored various networked information monitor templates as seen in the image below, which shows an exemplary Accused Apple Device storing Apple-Supported Apps, which, as discussed above, are constructed from data structures in .ipa files (NIM templates) that are downloaded to Accused Apple Devices by the Accused Apple Software and placed in electronic storage.



81.     Additionally, each Accused Apple Device meets limitation (b) of Claim 1 because the electronic storage in each Accused Apple Device contains a first networked information monitor template (the data structures in .ipa file for the Apple-Supported Apps) that has a content reference (such as a uniform resource locator ("URL") that comprises a network location at which content for the first networked information (such as stock price data) is accessible via the TCP/IP protocol employed by the internet). For example, the stock app is able to pull stock prices from a network location as seen in the image below:

28



82.     Moreover, the Accused Apple Devices infringe limitation (c) of Claim 1 because a definition of a graphical user interface of the first networked information monitor (such as the graphical user interface of the stock app) that lacks controls for manually navigating a network, and that includes a frame within which content (such as stock price data) received from the network location can be displayed, and frame characteristics defining one or more color, a size, or a position on the electronic display of the frame.

83.     Specifically, the data structures in .ipa files associated with Apple-Supported Apps in each Accused Apple Device are used to define a viewer graphical user interface (*e.g.*, a user interface presented on the screen) that may include menus, buttons, and other features. The data structures in .ipa files associated with Apple-Supported Apps in each Accused Apple Device contain the files related to the visual presentation of the application as suggested by Apple developer guides and seen in the excerpt below:

## 2. Performance

**2.1 App Completeness**
Submissions to App Review, including apps you make available for pre-order, should be final versions with all necessary metadata and fully functional URLs included; placeholder text, empty websites, and other temporary content should be scrubbed before submission. Make sure your app has been tested on-device for bugs and stability before you submit it, and include demo account info (and turn on your back-end service!) if your app includes a login. If you offer in-app purchases in your app, make sure they are complete, up-to-date, and visible to the reviewer, or that you explain why not in your review notes. Please don't treat App Review as a software testing service. We will reject incomplete app bundles and binaries that crash or exhibit obvious technical problems.

Source: https://developer.apple.com/app-store/review/guidelines/#design

84.     Additionally, the Accused Apple Devices infringe limitation (d) of Claim 1 because the data structures in .ipa files for Apple-Supported Apps in each Accused Apple Device include instructions configured (i) to cause the first networked information monitor to request content (such as stock price data) from the network location in the content reference via the TCP/IP protocol, and (ii) to cause the first networked information monitor to generate the graphical user interface of the first networked information monitor with the content (such as stock price data) received from the network location via the TCP/IP protocol within the frame.

85.     Specifically, data structures in .ipa files for Apple-Supported Apps (*e.g.,* the Stock app) includes instructions configured to request content from the network location (*e.g.,* address of the server containing the stock data) via a TCP/IP protocol, as shown by the excerpt below:



Source: https://developer.apple.com/app-store/review/guidelines/#performance.

Thus, each Apple-Supported App comprises the network location defined in the viewer GUI that fetches the content element over the network.

86.     And data structures in .ipa files for Apple-Supported Apps are used to define a viewer graphical user interface (*e.g.*, a user interface presented on the screen) that may include menus, buttons, and other features. The app resource contains the files related to the visual presentation of the Apple-Supported App as seen in the images below:



87.     Finally, each Accused Apple Device has an electronic display (such as the display of the Accused Apple Devices); and one or more processors configured to access the first networked information monitor template such that the graphical user interface of the first networked information monitor is presented to a user on the electronic display having content (such as stock price data) received from the content reference therein, as exemplified by the images below which show both the processor and the display along with an Apple-Supported App on the display.



## <u>The Accused Apple Devices Infringe the '407 Patent</u>

88.    The Accused Apple Devices infringe all of the claims of the '407 patent.

89.    For example, each Accused Apple Device satisfies each limitation of Claim

1 of the '407 patent, which recites the following limitations:

(preamble) A client computing device configured to access content over a network, the client computing device comprising:

(limitation (a)) electronic storage configured to store networked information monitor template associated with a networked information monitor, the networked information monitor template having therein a definition of a viewer graphical user interface having a frame within which time-varying content in a web browser-readable language may be presented on a display associated with the client computing device, wherein the frame of the viewer graphical user interface lacks controls for enabling a user to specify a network location at which content for the networked information monitor is available; and

(limitation (b)) one or more processors configured to execute one or more computer program modules, the one or more computer program modules being configured to access the networked information monitor defined by the networked information monitor template, wherein accessing the networked information monitor defined by the networked information monitor template results in:

(limitation (b1)) transmission, over a network to a web server at a network location, of a content request for content to be displayed within the frame of the viewer graphical user interface defined by the networked information monitor template;

32

(limitation (b2)) reception, over the network from the web server at the network location, of content transmitted from the web server in response to the content request, the content being time-varying;

(limitation (b3)) presentation, on the display, of the viewer graphical user interface defined by the networked information monitor template outside of and separate from any graphical user interface of any other application; and

(limitation (b4)) presentation, on the display within the frame of the viewer graphical user interface defined by the networked information monitor, of the time-varying content received from the web server.

90.     Specifically, each Accused Apple Device is a client computing device configured to access content over a network (such as the internet) as required by the preamble of Claim 1.

91.     And each Accused Apple Device meets limitation (a) of Claim 1 because it includes electronic storage configured to store a networked information monitor template associated with a networked information monitor, the networked information monitor template having therein a definition of a viewer graphical interface having a frame within which time-varying content (such as stock price, which varies over time) in a web browser-readable language may be presented on a display (monitor) associated with the client computing device (*i.e.,* an Accused Apple Device), wherein the frame of the viewer graphical user interface lacks controls for enabling a user to specify a network location (such as a URL) at which content (such as stock price data) for the networked information monitor is available. Such electronic storage is shown, for example, by the following breakdown of the Apple iPhone 11 that shows electronic flash storage:



92.     And each Accused Apple Device stores the data structures in .ipa files of the Apple-Supported Apps from the Apple App Store in its internal storage. Specifically, the Accused Apple Devices store in their internal electronic storage the data structures in .ipa files of the Apple-Supported Apps from the Apple App Store, as suggested by the image below:



Source https://support.apple.com/en-us/HT201656 /

93.     The data structures in .ipa files of the Apple-Supported Apps define a viewer graphical user interface (*e.g.,* a user interface presented on the screen) that may include menus, buttons, and other features. The data structures in .ipa files of the Apple-Supported Apps contain files related to the visual presentation of the application as suggested by Apple developer guides and seen in the excerpt below:

## 2. Performance

**2.1 App Completeness**
Submissions to App Review, including apps you make available for pre-order, should be final versions with all necessary metadata and fully functional URLs included; placeholder text, empty websites, and other temporary content should be scrubbed before submission. Make sure your app has been tested on-device for bugs and stability before you submit it, and include demo account info (and turn on your back-end service!) if your app includes a login. If you offer in-app purchases in your app, make sure they are complete, up-to-date, and visible to the reviewer, or that you explain why not in your review notes. Please don't treat App Review as a software testing service. We will reject incomplete app bundles and binaries that crash or exhibit obvious technical problems.

Source: https://developer.apple.com/app-store/review/guidelines/#design

94.     Moreover, Apple-Supported Apps, like the Stock app, provide time varying content which is presented on a display associated with the client computing device (*e.g.,* the Accused Apple Devices), wherein the frame of the viewer graphical user interface lacks controls for enabling a user to specify a network location (*e.g.,* user cannot specify the network location) at which content for the networked information monitor is available, as seen in the description from the Stock app below that notes a person can track their watchlist but does not permit a person to specify which server from which to obtain stock information.



95.     Additionally, the Accused Apple Devices meet limitation (b) of Claim 1 because they include one or more processors configured to execute one or more computer program modules, the one or more computer program modules being configured to access the networked information monitor defined by the networked information monitor template, as exemplified by the image below:



96.     Additionally, the Accused Apple Devices meet limitations (b1-b4) of Claim 1 because each Accused Apple Device includes, implements and uses Accused Apple Software to transmit, over a network (such as the internet) to a web server at a network location, a content request (such as a request for stock price data) for content (such as the stock price data) to be displayed within the frame of the viewer graphical user interface defined by the networked information monitor template.

97.     In particular, limitation (b1) of Claim 1 is met because each of the Accused

Apple Devices transmits a request for that content, as suggested by the screen shot

below, which shows a response to a request for a specific stock price:



98.     And limitation (b2) of Claim 1 is met because in response, there is a

reception, over the network (such as the internet) from the web server at the network

location, of content (such as stock price data) transmitted from the web server in

response to the content request (such as the request for stock price data), the content

being time-varying (such as stock price, which varies over time). For example, each

Accused Apple Device receives stock information over the network from the web server

at the network location that is time–varying because stock price data are time

dependent, as evidenced by the ability to track a watchlist of stocks.



99.     Moreover, limitation (b3) of Claim 1 is met as each Accused Apple Device

presents, on the display (monitor/screen), a viewer graphical user interface defined by

the networked information monitor template outside of and separate from any

graphical user interface of any other application (*i.e.,* the viewer graphical user interface

of the Stock app), as seen in the screen shot below:



100.     Finally, limitation (b4) of Claim 1 is met because on each Accused Apple

Device, the presentation, on the display (monitor/screen) within the frame of the

viewer graphical user interface, is defined by the networked information monitor (*i.e.,*

the viewer graphical user interface of the stock app), of the time-varying content (such

as stock price) received from the web server.

### Best Buy's Infringing Activities

101.    Upon information and belief, Defendant BBY has sold, sells, and offers for sale in its stores in this district certain Accused Apple Devices as seen in the images below:





Source: https://bit.ly/3Nue80q

102.     Persons with direct knowledge of BBY's infringement in this District include Alejandro Torrez, a specialty sales manager at Best Buy, and Todd Melikan, General Manager of Best Buy Stores in this District.

103.     Additionally, BBY sells and offers for sale each of the Accused Apple Devices in this district through its online store, as seen in the image below:



104.     DoDots will identify additional Accused Apple Devices pursuant to the Court's scheduling order.

## COUNT I – APPLE'S INFRINGEMENT OF THE '545 PATENT

105.     DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

106.     DoDots owns the entire right, title, and interest in the '545 patent and is entitled to sue for past, current and future infringement.

107.    Apple directly infringes one or more claims of the '545 patent in violation of 35 U.S.C. § 271 by, at least, implementing, operating, executing and using in the United States, the Accused Apple Software in each Accused Apple Device such that the implementation, operation, execution and use of an Accused Apple Software infringes one or more claims of the '545 patent. For example, Apple directly infringes, literally or under the doctrine of equivalents, at least claims 1-2, 9-10, 12 and 13 of the '545 patent.

108.    Apple directly infringes one or more claims of the '545 patent in violation of 35 U.S.C. § 271 by, at least, directly controlling and managing, and having direct responsibility for the implementation, operation, execution and use in the United States of the Accused Apple Software in each Accused Apple Device such that the implementation, operation, execution and use of an Accused Apple Software under Apple's direct control infringes one or more claims of the '545 patent. For example, Apple directly infringes, literally or under the doctrine of equivalents, at least claims 1-2, 9-10, 12 and 13 of the '545 patent.

109.    Apple directly infringes one or more claims of the '545 patent in violation of 35 U.S.C. § 271 by, at least, selling and offering to sell Accused Apple Devices together with an Accused Apple Software in the United States, wherein Apple specifically and intentionally designed and configured each of its Accused Apple Devices to implement, execute and use an Accused Apple Software such that the Accused Apple Software infringes one or more claims of the '545 patent. For example, Apple directly infringes, literally or under the doctrine of equivalents, at least claims 1-2, 9-10, 12 and 13 of the '545 patent.

110.    DoDots has not authorized, licensed, or otherwise permitted Apple to infringe the claims of the '545 patent.

111.    Apple is on notice of the '545 patent and, despite that notice, continues to infringe the '545 patent.

112.    As a result of Apple's infringement of the '545 patent, DoDots has suffered damages and will continue to suffer damages.

113.    Apple is therefore liable to DoDots in an amount that adequately compensates DoDots for Apple's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## COUNT II - APPLE'S INFRINGEMENT OF THE '083 PATENT

114.    DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

115.    DoDots owns the entire right, title, and interest in the '083 patent and is entitled to sue for past, current and future infringement.

116.    Apple directly infringes one or more claims of the '083 patent in violation of 35 U.S.C. § 271 by, at least, making, using, supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Apple Devices that read on one or more claims of the '083 patent. For example, Apple's Accused Devices, either directly infringe literally or under the doctrine of equivalents, at least claim 1 of the '083 patent.

117.    DoDots has not authorized, licensed or otherwise permitted Apple to infringe the claims of the '083 patent.

118.    Apple is on notice of the '083 patent and continues to infringe the '083 patent.

119.    As a result of Apple's infringement of the '083 patent, DoDots has suffered damages and will continue to suffer damages.

120.    Apple is therefore liable to DoDots in an amount that adequately compensates DoDots for Apple's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## COUNT III – APPLE'S INFRINGEMENT OF THE '407 PATENT

121.    DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

122.    DoDots owns the entire right, title, and interest in the '407 patent and is entitled to sue for past, current and future infringement.

123.    Apple is directly and indirectly infringing one or more claims of the '407 patent in violation of 35 U.S.C. § 271 by, at least, making, using, supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Apple Devices that read on one or more claims of the '407 patent. For example, Apple's Accused Devices directly infringe, literally or under the doctrine of equivalents, at least claim 1 of the '407 patent.

124.   DoDots has not authorized, licensed, or otherwise permitted Apple to infringe the claims of the '407 patent.

125.   Apple is on notice of the '407 patent and continues to infringe the '407 patent.

126.   As a result of Apple's infringement of the '407 patent, DoDots has suffered damages and will continue to suffer damages.

127.   Apple is therefore liable to DoDots in an amount that adequately compensates DoDots for Apple's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

### COUNT IV – BBY'S INFRINGEMENT OF THE '083 PATENT

128.   DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

129.   DoDots owns the entire right, title, and interest in the '083 patent and is entitled to sue for past, current and future infringement.

130.   BBY directly infringes one or more claims of the '083 patent in violation of 35 U.S.C. § 271 by supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Apple Devices that read on one or more claims of the '083 patent. For example, the Accused Apple Devices, directly infringe literally or under the doctrine of equivalents, at least claims 1-8 of the '083 patent.

131.   DoDots has not authorized, licensed or otherwise permitted BBY to infringe the claims of the '083 patent.

132.    As a result of BBY's infringement of the '083 patent, DoDots has suffered damages and will continue to suffer damages.

133.    BBY is therefore liable to DoDots in an amount that adequately compensates DoDots for BBY's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## COUNT V - BBY'S INFRINGEMENT OF THE '407 PATENT

134.    DoDots realleges and incorporates by reference here each of the allegations set forth in the preceding paragraphs.

135.    DoDots owns the entire right, title, and interest in the '407 patent and is entitled to sue for past, current and future infringement.

136.    BBY is directly infringing one or more claims of the '407 patent in violation of 35 U.S.C. § 271 by, at least supplying, distributing, importing, exporting, selling and/or offering for sale in the United States the Accused Apple Devices that read on one or more claims of the '407 patent. For example, the Accused Apple Devices either directly or indirectly infringe literally or under the doctrine of equivalents, at least claims 1-12 of the '407 patent.

137.    DoDots has not authorized, licensed or otherwise permitted BBY to infringe the claims of the '407 patent.

138.    As a result of BBY's infringement of the '407 patent, DoDots has suffered damages and will continue to suffer damages.

139.    BBY is therefore liable to DoDots in an amount that adequately compensates DoDots for BBY's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. §§ 284-285.

## JURY DEMAND

140.    DoDots hereby respectfully requests a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38.

## REQUEST FOR RELIEF

WHEREFORE, DoDots respectfully requests the following relief:

A.    A judgment that Apple has infringed each of the patents-in-suit;

B.    A judgment that BBY has infringed the '083 patent and the '407 patent;

C.    An accounting and an award of damages pursuant to 35 U.S.C. § 284 adequate to compensate for Defendants' infringements of DoDots' patents-in-suit, and in no event less than a reasonable royalty for Defendants' acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

D.    A finding that this is an exceptional case under 35 U.S.C. § 285 entitling DoDots to enhanced damages up to a trebling and an award of attorneys' fees;

E.    That Defendants be ordered to pay all of DoDots' costs associated with this action; and

F.    Any other remedy to which DoDots may be entitled.

Dated: May 24, 2022                    Respectfully submitted,

                                       */s/ Raymond W. Mort, III*
                                       Raymond W. Mort, III
                                       Texas State Bar No. 00791308
                                       raymort@austinlaw.com
                                       **THE MORT LAW FIRM, PLLC**
                                       100 Congress Ave, Suite 2000
                                       Austin, Texas 78701
                                       Tel/Fax: (512) 865-7950

                                       *Of Counsel:*
                                       Ronald M. Daignault (*pro hac vice to be requested*)*
                                       Chandran B. Iyer (*pro hac vice to be requested*)
                                       Shalu Maheshwari (*pro hac vice to be requested*)*
                                       Richard Juang (*pro hac vice to be requested*)*
                                       Oded Burger (*pro hac vice to be requested*)*
                                       Zachary H. Ellis (State Bar No. 24122606)*
                                       rdaignault@daignaultiyer.com
                                       cbiyer@daignaultiyer.com
                                       smaheshwari@daignaultiyer.com
                                       rjuang@daignaultiyer.com
                                       oburger@daignaultiyer.com
                                       zellis@daignaultiyer.com
                                       **DAIGNAULT IYER LLP**
                                       8618 Westwood Center Drive
                                       Suite 150
                                       Vienna, VA 22102
                                       *Not admitted in Virginia

                                       Brian S. Seal (*pro hac vice to be requested*)
                                       **TAFT STETTINIUS & HOLLISTER LLP**
                                       200 Massachusetts Ave., Suite 400
                                       Washington, D.C. 20001
                                       Tele: (202) 664-1537
                                       bseal@taftlaw.com

                                       **ATTORNEYS FOR PLAINTIFF**